UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

UNITED STATES,

    -against-

VADIM NEKRITIN and IGOR LOSHAKOV,

       *Defendants*.

----------------------------------X

**MEMORANDUM & ORDER**

10-cr-491(S-2) (KAM)

**MATSUMOTO, United States District Judge:**

      Following a jury trial, defendant Vadim Nekritin ("Dr. Nekritin") was convicted of four counts of health care fraud, and defendant Igor Loshakov ("Dr. Loshakov") was convicted of three counts of health care fraud. Before the court is defendants' motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). For the reasons set forth below, the motion for a judgment of acquittal is denied.

**BACKGROUND**

**I.  The Charges**

      On May 31, 2011, Drs. Nekritin and Loshakov (collectively, "defendants") were charged by a second superseding indictment with conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1349 and 3551 *et seq.*, and substantive counts of health care fraud, in violation of 18 U.S.C. §§ 1347 and 3551 *et seq*. (*See* ECF No. 58, Superseding

Indictment (S-2) as to Vadim Nekritin, Igor Loshakov ("Ind't").)[1]

Count one charged both defendants together with conspiracy to commit health care fraud. (*Id.* ¶¶ 18-19.) Counts two through five charged Dr. Nekritin with health care fraud relating to beneficiaries L.D., G.P., L.R., and E.S., respectively.[2] Counts six through eight charged Dr. Loshakov with health care fraud relating to beneficiaries R.D., F.G., and I.G., respectively. (*Id.* ¶¶ 20-21.)

The fraudulent scheme alleged in the second superseding indictment was as follows:

> 16. The defendants VADIM NEKRITIN and IGOR LOSHAKOV solicited Medicare and Medicaid beneficiaries and provided them with a variety of podiatric services. In many cases, Medicare and Medicaid beneficiaries came to the defendants' offices to have their feet cleaned and moisturized, and their toenails cut and cleaned with alcohol. This procedure was either done by the defendants NEKRITIN and LOSHAKOV or their employees.

> 17. The defendants VADIM NEKRITIN and IGOR LOSHAKOV then submitted, or caused to be submitted to Medicare and Medicaid claims falsely billing for chemical cauterizations,[3]

---

[1] Count one of the second superseding indictment charged Drs. Nekritin and Loshakov with conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1349 and 3551 *et seq.* (Ind't ¶¶ 18-19.) Counts two through five charged Dr. Nekritin with health care fraud, and counts six through eight charged Dr. Loshakov with health care fraud, in violation of 18 U.S.C. §§ 1347 and 3551 *et seq.* (*Id.* ¶¶ 20-21.)

[2] To protect their privacy, the patients are referred to herein by their initials.

[3] The second superseding indictment defined chemical cauterization ("chemical cauterization of granulation tissue" or "CCGT") as follows:

2

when, in fact, those procedures were not
medically necessary and had not been
provided to the Medicare and Medicaid
beneficiaries.

(*Id.* ¶¶ 16-17.)

## II. The Evidence at Trial

The court assumes the parties' familiarity with the

underlying facts and procedural history of this case. Further,

the parties' briefs in connection with this motion set forth the

evidence presented at trial, and the court will not restate that

evidence except insofar as it is relevant to the instant motion.

Defendants' trial lasted approximately eight days,

during which the government presented testimony from a medical

expert, Dr. Edwin Wolf (*see* Tr. 195); Dr. Nekritin's patients

L.D., G.P., and E.S. (*see id.* 392, 426, 567)[4]; Dr. Loshakov's

patients F.G. and I.G. (*see id.* 461, 491)[5]; a Medicare

representative (*see id.* 79); a data analyst for a company that

_____

Chemical cauterizations entailed the destroying of
living tissue by a caustic chemical substance such as
silver nitrate. The purpose of the procedure was to
destroy a form of exuberant or excessive healing
tissue known as granulation tissue or proud flesh. A
chemical cauterization was considered a surgical
procedure and, therefore, when administered to a
patient's foot, had to be performed by a licensed
Doctor of Podiatric Medicine to qualify for
reimbursement under Medicare and Medicaid. Medicare
and Medicaid reimbursed doctors for qualifying
chemical cauterizations.

(ECF No. 58, Ind't ¶ 8.)

[4] Dr. Nekritin's patient L.R., mentioned in count four of the second
superseding indictment, did not testify at trial.

[5] Dr. Loshakov's patient R.D., mentioned in count six of the second
superseding indictment, did not testify at trial.

detects fraud and abuse in Medicare and Medicaid billing (*see id.* 510); two FBI agents (*see id.* 168, 177, 608); two computer forensic examiners with the United States Health and Human Services Office (*see id.* 452, 544); and a legal specialist from JP Morgan Chase Bank (*see id.* 603). The government also introduced a number of exhibits, including but not limited to the medical files of the seven patients mentioned in counts two through eight, respectively. In their defense, defendants presented testimony from a medical expert, Dr. Robert Biller. (*See id.* 682.) Dr. Loshakov also presented a character witness. (*See id.* 827.) Each defendant testified on his own behalf, claiming that he had, or believed in good faith that he had, performed the chemical cauterization of granulation tissue ("CCGT") procedures for which he had billed Medicare and Medicaid. (*See id.* 875, 942, 945, 951, 958, 960, 963, 1142, 1153, 1167, 1169-70.) On rebuttal, the government presented testimony from the vice president of a pharmaceutical manufacturing company. (*See id.* 1319.)

After deliberations, the jury found Dr. Nekritin guilty on counts two through five and Dr. Loshakov guilty on counts six through eight, all charging the substantive crime of health care fraud. (*See* ECF No. 98, Court Ex. 5a, Jury Verdict, filed 7/5/2011 ("Jury Verdict").) Both defendants were

acquitted on count one, which charged a conspiracy to commit health care fraud. (*See id.*)

## III. Motions for Judgment of Acquittal

At the close of the government's case, defendants moved for a judgment of acquittal pursuant to Rule 29(a). (*See* ECF No. 93, Letter Motion for Directed Verdict, filed 6/27/2011; Tr. 675.) The court reserved ruling on the motion. (*See* Tr. 675.)

After the jury returned a verdict of guilty on counts two through eight, (*see* ECF No. 98, Jury Verdict), the defense again moved for a judgment of acquittal. On September 19, 2011, Dr. Nekritin filed a memorandum of law in support of his motion, arguing that (1) Dr. Nekritin is entitled to a judgment of acquittal on count four of the second superseding indictment because the government failed to present sufficient evidence with respect to patient L.R. to sustain a conviction; (2) Dr. Nekritin is entitled to a judgment of acquittal on counts two through five of the second superseding indictment because the government failed to present sufficient evidence that Dr. Nekritin possessed the necessary intent to defraud; and (3) Dr. Nekritin is entitled to a judgment of acquittal on counts two through five because the government failed to present sufficient evidence that the CCGT procedures were not medically necessary for the patients presented at the time the care was rendered.

(*See* ECF No. 104, Motion to Set Aside Verdict by Vadim Nekritin, filed 9/19/2011 ("Def. Mot.").)  Although Dr. Loshakov did not file a memorandum of law in support of his motion for a judgment of acquittal, his attorney filed a letter on September 20, 2011 stating that he "adopt[s] all the arguments in [Dr. Nekritin's] motion as it relates [sic] to Dr. Loshakov."  (ECF No. 105, Letter from Richard N. Wool, Esq. to Honorable Kiyo A. Matsumoto, filed 9/20/2011 ("Wool Ltr.").)  The government opposed the motion on October 7, 2011.  (*See* ECF No. 106, Government's Memorandum of Law in Opposition to the Defendants' Motion for a Judgment of Acquittal, filed 10/7/2011 ("Gov't Opp.").)  Defendants did not file a reply.

<u>**DISCUSSION**</u>

**I.   Rule 29 Motion**

Rule 29(a) provides that a district court shall enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  A district court entertaining a motion for a judgment of acquittal, however, must be "careful to avoid usurping the role of the jury . . . ."  *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003) (citation omitted).  Thus, "Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."

*United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)
(citation omitted).  Rather, in assessing a Rule 29 motion, a
court must defer to the jury's resolution of witnesses'
credibility and its selection between competing inferences that
could be drawn from the evidence.  *United States v. Tocco*, 135
F.3d 116, 123 (2d Cir. 1998).  This requires the court to
consider the evidence in the light most favorable to the
government and to draw all permissible inferences that the jury
may have drawn in the government's favor.  *Jackson,* 335 F.3d at
180.

Consistent with this deference, a jury verdict must be
upheld if "*any* rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt."
*Tocco*, 135 F.3d at 123 (emphasis in original) (quoting *Jackson
v. Virginia*, 443 U.S. 307, 319 (1979)).  Moreover, the jury's
verdict will be upheld even when it is based entirely on
inferences from circumstantial evidence.  *See United States v.
Mariani*, 725 F.2d 862, 865-66 (2d Cir. 1984); *see also United
States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) ("Direct
evidence is not required; '[i]n fact, the government is entitled
to prove its case solely through circumstantial evidence,
provided, of course, that the government still demonstrates each
element of the charged offense beyond a reasonable doubt.'")
(quoting *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir.

2004)).  Finally, a court reviewing the sufficiency of the evidence must be careful not to analyze particular pieces of evidence in isolation, but instead should consider the evidence in its totality.  *See United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993).

Only where the evidence that the defendant committed the crime alleged is either "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt" may a district court grant a Rule 29 motion.  *Guadagna*, 183 F.3d at 130 (citation omitted).  Consequently, "[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient" under Rule 29.  *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002) (quoting *United States v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001)).  However, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks and citation omitted).

## II.  Application

In the instant case, both defendants were charged and convicted pursuant to 18 U.S.C. § 1347, which provides, in pertinent part:

> Whoever knowingly and willfully executes or
> attempts to execute, a scheme or artifice –
>
>> (1) to defraud any health care benefit
>> program; or
>>
>> (2) to obtain, by means of false or
>> fraudulent pretenses, representations, or promises,
>> any of the money or property owned by, or under the
>> custody or control, of any health care benefit
>> program,
>>
>> in connection with the delivery of or
>> payment for health care benefits, items, or services
>> shall be [guilty of a crime].

18 U.S.C. § 1347. Thus, with respect to the counts alleging the substantive crime of health care fraud, the government bore the burden of proving at trial, beyond a reasonable doubt, that: (1) there was a scheme to defraud; (2) the defendant knowingly and willfully executed or attempted to execute that scheme, with the intent to defraud; and (3) the target of the scheme was a health care benefit program. *See* 2 Leonard B. Sand et al., Modern Federal Jury Instructions – Criminal, P 44.03, Instruction 44-14 at 44-71 (2008); *see, e.g.*, *United States v. Shteyman*, No. 10-CR-347, 2011 U.S. Dist. LEXIS 55202, at *15 n.6 (E.D.N.Y. May 23, 2011).

## A. Medical Necessity

Defendants argue that the government failed to prove a necessary element of the alleged "scheme to defraud" because the second superseding indictment alleges, in the conjunctive, that the CCGT procedures both "were not medically necessary and had

not been provided," and the government "failed to present any reliable evidence that the chemical cauterizations were not medically necessary for the patients presented at the time the care was rendered." (ECF No. 104, Def. Mem. at 7.) Accordingly, defendants seek a judgment of acquittal on all counts.

Defendants' argument fails as a matter of law because it is proper for an indictment to charge alternate theories of liability. It is well established that "[a]n indictment may charge alternate ways of violating a statute in the conjunctive, and a conviction under such an indictment will be sustained if the evidence justifies a finding that the statute was violated in any of the ways alleged." *United States v. Astolas*, 487 F.2d 275, 280 (2d Cir. 1973) (citation omitted); *see also United States v. Rutkoske*, 506 F.3d 170, 176 (2d Cir. 2007) (affirming securities fraud conviction where two theories of liability were alleged and evidence was sufficient to establish at least one of them). The United States Supreme Court has made clear that there is "no exception" to the rule that "[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Griffin v. United States*, 502 U.S. 46, 56-57 (1991) (quoting *Turner v. United States*, 396 U.S. 398, 420 (1970)).

Accordingly, whether or not the government proved the defendants' guilt under its "medical necessity" theory, the verdict must stand because, as described below, the evidence was sufficient to support the government's theory that the CCGT procedures were not performed.

**B.    Intent to Defraud**

Defendants further contend that they are entitled to a judgment of acquittal on all counts because the government's evidence at trial failed to establish intent to defraud. (ECF No. 104, Def. Mem. at 5.) This argument also fails.

At trial, the government offered the following evidence of defendants' criminal intent to defraud Medicare and Medicaid by billing for CCGT procedures that they had not, in fact, performed. The government presented the medical files of four of Dr. Nekritin's patients: G.P., E.S., L.D., and L.R. (*See* Government Exhibit ("GX") 9, GX 10, GX 12, GX 11.) For each patient, for nearly every visit, the file stated that the patient presented with "open lesions" and "visible granular tissue" and complained of "painful fissuring" in both heels. (*See id.*) According to the patients' files, Dr. Nekritin performed at least 17 CCGT procedures on G.P., 4 on E.S., 13 on L.D., and 13 on L.R., each procedure occurring more than 60 days after the last one. (*See id.*) Although when L.R. presented on one visit with a ganglionic cyst, Dr. Nekritin submitted a fluid

sample for laboratory analysis, (*see* GX 11; Tr. 277), none of
the patient files indicated that Dr. Nekritin ever submitted
samples of the patients' "visible granular tissue" for testing.

In juxtaposition with the files, the government
offered the testimony of G.P., E.S., and L.D., none of whom
recalled ever having open wounds, cracks, or puffy tissue on
their feet or heels.  Instead, G.P. testified that the only
problems he had ever reported to Dr. Nekritin related to a
fungus and his nails.  (Tr. 397.)  E.S. stated that she had
never had pain in her heels.  (*Id.* 429.)  G.P. and L.D. both
testified that on each visit, Dr. Nekritin – or, in L.D.'s case,
sometimes a technician – merely removed the dry skin from their
feet, trimmed their toenails, and applied alcohol or cream to
their feet.  (*See id.* 397-98, 413, 432, 571-73, 580.)  E.S.
described her treatment as a "pedicure."  (*Id.* 427-29.)

With respect to Dr. Loshakov, the government presented
the patient files of F.G., I.G., and R.D.  (*See* GX 13, GX 14, GX
15.)  All three files stated that the patients had presented on
numerous occasions with "painful heel fissures" on both heels,
requiring CCGT procedures.  (*See id.*)  According to the files,
Dr. Loshakov performed at least 18 CCGT procedures on F.G, 10 on
I.G., and 12 on R.D., each procedure more than 60 days after the
last one.  (*See id.*)  Notably, however, F.G.'s file demonstrated
that on six separate occasions when F.G. saw Dr. Loshakov fewer

than 60 days after his last CCGT, the doctor did not observe any heel fissures or perform a CCGT procedure. (*See* GX 13.) Similarly, R.D.'s medical file showed the same pattern, namely, that for each of the six times that R.D. visited Dr. Loshakov fewer than 60 days after her prior CCGT, Dr. Loshakov neither observed heel fissures nor performed a CCGT. (*See* GX 15.)[6]

In contrast, both I.G. and F.G. testified at trial that the treatment they received from Dr. Loshakov was "purely cosmetic." (Tr. 503, 488.) F.G. testified that every time he saw Dr. Loshakov, the doctor cleaned his feet, cut his nails, and applied cream. (*Id.* 476-77.) Although he admitted on cross-examination that he could not see exactly what Dr. Loshakov was doing to the bottom of his feet, F.G. stated that he could "see the doctor changing the add-ons on his instrument and performing specific functions on the bottom of [his feet]." (*Id.* 488.) F.G. further stated that he could "feel what [Dr. Loshakov was] doing." (*Id.*) I.G. testified that Dr. Loshakov cut her nails, removed rough skin, and treated "very very small cracks" on her heels. (*Id.* 495, 502.) She stated that although she could see what Dr. Loshakov was doing while he was treating her feet, sometimes she closed her eyes during treatment. (*Id.*

---

[6] The government also presented James Bavoso, a Medicare billing representative, who testified that routine foot care, which involves the trimming of toenails, can only be billed to Medicare every 60 days. (Tr. 131-32.)

506.)  Neither of them ever experienced pain, deep fissures, or red puffy tissue in their heels.  (*See id.* 474-76, 487, 493, 496.)

Dr. Edwin Wolf, a board-certified podiatrist, also testified for the government as an expert witness.  (*Id.* 195, 199, 202.)  Dr. Wolf explained that a CCGT is a procedure used by physicians to treat exuberant granulation tissue, which is painful, "beefy red oozing exuberant tissue" that impedes the normal healing process in an open wound.  (*Id.* 215-16, 219-23, 301.)  To remove and destroy the exuberant granulation tissue, physicians apply a cauterizing agent, such as electricity or a chemical.  (*Id.* 224-25, 228.)  When silver nitrate is used as a cauterant, Dr. Wolf stated, it would be expected to stain a person's skin black.  (*Id.* 231-37.)

Dr. Wolf testified that when heel fissures occur, they do so on an infrequent, irregular basis, rather than the regular intervals of at least 60 days reflected in defendants' patients' medical records.  (*Id.* 213-14, 252-53.)  In more than 30 years of practice as a podiatrist – during which he had performed CCGT procedures on average once a week – Dr. Wolf could not recall seeing more than one or two patients with exuberant granulation tissue in heel fissures, and it was "certainly not a frequent and regular event."  (*Id.* 224, 229.)  Dr. Wolf stated that in the event a patient had recurring heel fissures requiring

surgical treatment approximately every two months, a physician would take steps to determine the cause by submitting tissue for pathology analysis and adjusting the course of treatment.  (*See id.* 214, 252-53, 256, 274, 281, 296-97.)

Upon review of each of the seven patients' medical files, Dr. Wolf noted that defendants billed Medicare and Medicaid for CCGT procedures on a recurring basis at regular intervals of approximately two months over the course of several years, but never submitted tissue samples for laboratory testing or changed the course of treatment.  (*See id.* 249-53, 273-74, 282-87, 294-95, 297.)  Based on his review of the medical files and his own experience as a podiatrist, Dr. Wolf concluded, "the treatment provided is highly suspect specifically because of the exact repeated problem with the consistent exact repeated treatment on such a reliable schedule, being just over 60 days on a regular basis."  (*Id.* 252; *see also id.* 256, 274.)

Dr. Wolf's opinion based on the patients' medical files was reaffirmed by his interviews with several of the patients whose files he had reviewed.  In particular, Dr. Wolf interviewed I.G., R.D., L.D., E.S., and G.P. about the medical treatment they had received from defendants.  (*See id.* 304.)  Dr. Wolf concluded:

> Based on my discussion with them, them
> telling me that they never had the types of
> skin problems, types of granulation tissue

that would ooze and weep, and never had any
types of pain associated with it, the
regularity of treatments that were made for
them at the visit, for the next visit and
the fact that there was never any
discoloration as would be associated with
silver nitrate treatment, I concluded those
procedures were not performed.

(*Id.* 304-05.)

Defendants' challenge to the sufficiency of the
evidence is based on their claim that the testimony of their
patients was "inherently unreliable" and that "[t]he conclusions
drawn by Dr. Wolf, as a result, were equally weak in evidentiary
value." (ECF No. 104, Def. Mem. at 6.) It is axiomatic,
however, that "the credibility of witnesses is the province of
the jury and [the court] simply cannot replace the jury's
credibility determinations with [its] own." *United States v.
James*, 239 F.3d 120, 124 (2d Cir. 2000) (quoting *United States
v. Khan*, 53 F.3d 507, 514 (2d Cir. 1995)). Other than the
patients' age, language, and the time elapsed since their last
treatments, defendants have identified no reason to discount the
witnesses' testimony. *See United States v. Custodios*, 325 F.
App'x 19, 22 (2d Cir. 2009) (denying Rule 29 motion where
defendant argued that "the government's evidence was
insufficient because it consisted primarily of the testimony of
unreliable and interested witnesses"). Further, the jury was
entitled to credit the testimony of Dr. Wolf, who testified

based on his own experience as a podiatrist, as well as his review of the files of all seven patients and personal interviews with five of the patients. If credited, this testimony establishes that defendants knowingly did not perform the CCGT procedures billed for these patients, despite regularly and repeatedly billing for performing this procedure on each of the patients over a period of several years. Based on the court's own familiarity with the trial and the testimony of the patients and Dr. Wolf, the court finds that their testimony was not so untrustworthy as to warrant Rule 29 relief.

In the alternative, defendants claim that the additional evidence adduced at trial rendered the government's evidence legally insufficient. (ECF No. 104, Def. Mem. at 6.) Specifically, Dr. Nekritin points to his own testimony that he "believed in good faith, that the procedure he performed was medically necessary and properly billed . . . ." (*Id.; see also* Tr. 905-11, 1091-92.) When a criminal defendant testifies in his own defense, however, his testimony is weighed by the jury in the same manner as that of other witnesses. *United States v. Brutus*, 505 F.3d 80, 88 (2d Cir. 2007) (noting that jury should be instructed that "if the defendant has testified, . . . [the jury must] evaluate the defendant's testimony in the same way it judges the testimony of other witnesses"); *United States v. Gaines*, 457 F.3d 238, 249 (2d Cir. 2006) (same). Here, the jury

was entitled to weigh the testimony of defendants against that of the government's witnesses and conclude that the defendants were not credible.  Accordingly, viewed in the light most favorable to the government, the government presented more than enough evidence to permit a rational jury to reject defendants' "good faith" defense and find that defendants executed a scheme to defraud Medicare and Medicaid by knowingly billing for CCGT procedures, knowing that they had not performed the procedures.

### C.  Counts Four and Six

Dr. Nekritin argues that the evidence presented at trial was insufficient to support his conviction on count four, *i.e.*, health care fraud with respect to patient L.R., who did not testify at trial and whom Dr. Wolf did not interview.  (ECF No. 104, Def. Mem. at 4.)  Because Dr. Loshakov's counsel stated that he "adopt[ed] all the arguments in [Dr. Nekritin's] motion as [they relate] to Dr. Loshakov," (ECF No. 105, Wool Ltr.), the court presumes that he seeks to argue that the evidence presented at trial was insufficient to support Dr. Loshakov's conviction on count six, *i.e.*, health care fraud with respect to patient R.D., who also did not testify at trial.

Viewing the record as a whole, the evidence at trial was sufficient for a rational jury to find Dr. Nekritin guilty on count four and Dr. Loshakov guilty on count six. Specifically, the evidence was sufficient for the jury to find

that CCGT procedures billed to Medicare and Medicaid had not, in fact, been performed on L.R. or R.D.

As noted above, L.R.'s patient file demonstrated that she saw Dr. Nekritin 14 times between October 2007 through January 2010, at intervals of slightly more than 60 days. (*See* GX 11.) At every visit, Dr. Nekritin noted that L.R. complained of painful heel fissures and documented that he performed a CCGT procedure using silver nitrate. (*See id.*) After each visit, L.R. was scheduled for another routine appointment in six to eight weeks. (*See id.*) In total, L.R.'s file indicated that Dr. Nekritin performed at least 13 CCGT procedures on L.R.'s heels over the course of two and a half years. (*See id.*) Although L.R.'s patient file showed that when she had a ganglionic cyst, Dr. Nekritin sent a sample to the laboratory for analysis, (*see id.; see also* Tr. 279), there was no indication that he ever sent a sample of her abnormal, exuberant granulation tissue for testing.

Similarly, the patient file of R.D. showed that Dr. Loshakov performed at least 12 CCGT procedures on R.D. between December 2006 and December 2009. (*See* GX 15.) At every visit where a CCGT procedure was performed, Dr. Loshakov noted that he saw heel fissures on both heels "with visible granular tissue and tenderness upon palpation" and told R.D. to return in two months. (*See id.*) Notably, the six times between December 2006

and December 2009 that R.D. saw Dr. Loshakov fewer than 60 days
after her last CCGT, the doctor did not observe any heel
fissures or perform a CCGT procedure. (*See id.*) Further,
although Dr. Loshakov continued to treat R.D. through at least
September 2010, he never documented any further heel fissures or
performed any CCGT procedures on R.D. after he was indicted in
the instant case in March 2010. (*See id.; see also* Tr. 1244.)
R.D.'s file contains no indication that Dr. Loshakov ever sent a
sample of her abnormal, exuberant granulation tissue for
laboratory analysis.

In light of Dr. Wolf's testimony that the condition of
excessive granulation tissue occurring in heel fissures was
rare, that such a condition would not recur in regular 60-day
intervals, and that if it did, a physician would send a sample
for laboratory analysis, the jury was warranted in finding that
the patients did not, in fact, have this abnormal condition
recur with the frequency and severity indicated in their files
and that defendants never performed the CCGT procedures relating
to L.R. and R.D., respectively, for which they billed Medicare
and Medicaid.

Moreover, contrary to Dr. Nekritin's argument, he was
not unduly prejudiced by the jury's consideration of counts two,
three, and five in connection with count four. (*See* ECF No.
104, Def. Mem. at 4.) Nor was Dr. Loshakov unduly prejudiced by

the jury's consideration of counts seven and eight in connection with count six. "Unfair prejudice does not result if evidence admissible to prove each charge is also admissible to prove the other charge." *United States v. Peoples*, 748 F.2d 934, 936 (2d Cir. 1984). Federal Rule of Evidence 404(b) provides that although "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith[,] [i]t may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).

Here, evidence of each scheme to defraud Medicare and Medicaid would have been admissible in a separate trial of the other schemes to show, among other things, intent, knowledge, and the absence of mistake. In particular, to the extent that Dr. Nekritin could have argued on count four that he lacked the intent to defraud Medicaid and Medicare with respect to L.R., evidence regarding his alleged schemes to defraud Medicare and Medicaid with respect to G.P., E.S., and L.D. would have been admissible under Rule 404(b) to demonstrate his intent, plan, and lack of mistake. Similarly, evidence of Dr. Loshakov's fraudulent schemes alleged in counts seven and eight would have been admissible in a separate trial on count six. *See* Fed. R. Evid. 404(b); *see also United States v. Meszaros*, No. 06-CR-290,

21

2008 U.S. Dist. LEXIS 96014, at *27-29 (E.D.N.Y. Nov. 25, 2008)
(denying severance of different counts of wire fraud relating to
two schemes to defraud where the basic facts of both schemes
were similar and evidence of one scheme would be admissible in a
separate trial on the other scheme), *aff'd in relevant part*, 381
F. App'x 55, 56 (2d Cir. 2010).  Moreover, the jurors in this
case were issued a limiting instruction clearly directing them
to consider each count separately.  (Tr. 1561.)

Viewed in the light most favorable to the government,
the evidence at trial provided an adequate basis for a rational
jury to infer that defendants intended to carry out a scheme to
defraud Medicare and Medicaid with respect to L.R. and R.D.,
respectively, in the same way that they did with respect to the
patients who testified at trial.  *See United States v. Martinez*,
No. 98-1438, 1999 U.S. App. LEXIS 1154, at *4-5 (2d Cir. Jan.
27, 1999) (where some defrauded homeowners did not testify at
trial, the court nevertheless upheld defendant's mail fraud
conviction where all the evidence at trial "provided an adequate
basis for a rational jury to infer that this transaction was
fraudulent in the same way all the others were").  Accordingly,
defendants' motion for a judgment of acquittal on counts four
and six is denied.  *See Jackson,* 335 F.3d at 180 (finding that a
jury verdict must be upheld if "*any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt") (internal quotation omitted).

**CONCLUSION**

For the reasons set forth above, defendants' motion for judgment of acquittal pursuant to Rule 29 is denied.  All parties shall appear for a forfeiture hearing on February 10, 2012 at 2:00 p.m., unless they advise the court by January 24, 2012 that the parties have agreed on the amount to be forfeited and a hearing is not necessary.

**SO ORDERED.**

Dated:      January 9, 2012
            Brooklyn, New York

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York